## SCHULTE et al. v. BOARD OF COUNTY COMR'S et al.

No. 15065—Opinion Filed Oct. 27, 1925.

Rehearing Denied Oct. 26, 1926.

**1. Municipal Corporations — Funding Indebtedness — Protest to Funding Judgments—Procedure.**

Section 4268, Comp. St. 1921, authorizes municipal corporations to fund their outstanding legal indebtedness, including bonds, judgments, and warrants. The right to contest granted to interested parties by section 4269, Comp. St. 1921, means that the protest against the funding of judgments shall be made in accordance with the established legal and equitable rules relating to the validity of judgments of courts of record. The

hearing and trial provided by section 4270, Comp. St. 1921, in relation to the issuance of funding bonds based upon judgments of a court of general jurisdiction must be governed by the preceding rules.

**2. Judgment—Collateral Attack — Errors in Quasi Jurisdictional Acts.**

Errors, if any, in matters of quasi jurisdictional nature, which may be committed by a court of general jurisdiction in the course of the trial of a cause, over which it has jurisdiction, are not reflected in the judgment of the court. The judgment of a court of general jurisdiction entered in the trial of a cause, over which it has jurisdiction, is not subject to collateral attack for errors, if any, committed in relation to quasi jurisdictional acts, in the course of exercising jurisdiction over the subject-matter, vested in the court by the Constitution or statutory laws.

**3. Same—Attack for Extrinsic Fraud.**

The judgment of a court of general jurisdiction is subject to attack for collusive acts, or for fraud, which is extrinsic or collateral to the issues involved in the trial of the cause. It is immaterial whether the attack be collateral or direct, when based upon fraud as defined in this paragraph.

**4. Same—Equitable Proceeding — Appeal —Sufficiency of Evidence.**

The attack on a judgment rendered by a court on the grounds of fraud is in the nature of an equitable proceeding: The judgment rendered in a proceeding attacking a judgment upon the ground of fraud will not be reversed upon appeal, unless the judgment be clearly against the weight of the evidence.

**5. Same — Funding of Judgments Against County Sustained.**

Record examined; held, to support the judgment of the court denying the cancellation of the judgments and ordering the funding of the judgments.

(Syllabus by Stephenson, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court, Pontotoc County; A. C. Barrett, Assigned Judge.

Action by the Board of County Commissioners of Pontotoc County to fund certain outstanding legal indebtedness. W. F. Schulte et al. intervened in the cause, protesting against issuing the bonds. Judgment was entered ordering the funding of the indebtedness. Interveners bring error. Affirmed.

W. F. Schulte, pro se, and for other plaintiffs in error.

J. W. Dean, I. M. King, John P. Crawford, and John Blanford, for defendants in error.

Opinion by STEPHENSON, C. The board of county commissioners of Pontotoc county entered into contracts with certain bridge companies to reconstruct several steel bridges, which had been damaged and destroyed by flood waters in the summer of 1921. The bridges were constructed, apparently, in a satisfactory manner to the board of county commissioners, and all other parties concerned until the funding proceedings were commenced in June, 1923. The bridge companies entered their suits against the board of county commissioners of Pontotoc county to recover the contract price for constructing the bridges. Judgments were entered in the cases in favor of the bridge companies as follows:

Cause No. 6281, Walter Simons judgment, _____$4,400.00

Cause No. 6282, Boardman Co. judgment, _____ 4,846.00

Cause No. 6320, Mann Constructing Co. judgment, _____ 8,600.00

The total of the three judgments is $17,-846. The judgments are regular upon their face and the findings of fact made in the journal entries show that the judgments were rendered for a valid indebtedness against Pontotoc county. An action was commenced by W. H. Wells, as assignee, No. 6246, in the district court of Pontotoc county, against the board of county commissioners for the recovery of $32,000. The evidence of indebtedness sued on in the latter action was represented by numerous claims, which appear regular and valid upon their face. The first of the judgments involved in this action was entered along in the summer of 1921, and the last was entered in June, 1923. The board of county commissioners of Pontotoc county commenced proceedings in the district court of that county on the 18th day of June, 1923, to fund these judgments.

W. F. Schulte et al. filed application in the original actions as numbered above to cancel the judgments. The petition for cancellation of the judgments alleged in substance: (1) That J. W. Bolen, the district judge who resided in Pontotoc county, was interested in the action. (2) That the petitions in each of the causes failed to state a cause of action in favor of the plaintiffs and against the defendants. (3) That the district court of Pontotoc county, which entered the four judgments, did not have jurisdiction of the subject-matter. (4) That the judgments were procured through fraud and collusion by the plaintiffs and the

defendant board of county commissioners, with the intent to defraud the taxpayers of Pontotoc county. (5) That the plaintiffs based their suits upon false and fictitious claims, which did not exist in law and in fact.

Schulte filed what he termed a protest in the proceedings for funding the judgments rendered in the four causes as numbered herein. The respondents embodied the foregoing grounds in their protest to the issuing of the funding bonds, with the additional ground:

"That the board of county commissioners failed to cause notice by publication and by posting to be given in the funding bond proceedings, as is required by the statutes."

The plaintiffs lodged demurrers to the petition of Schulte filed in the several causes as numbered herein, on the ground that the pleadings for the cancellation of the judgments did not entitle him to the relief prayed for.

The court ordered the causes, in which proceedings had been commenced to cancel the judgments, to be consolidated with the funding bond proceeding. Thereupon, the demurrers to the petitions for the cancellation of the judgments were presented to the court and were sustained.

The respondent did not ask leave to amend his petitions, nor were the judgments rendered on the pleadings against Schulte. The latter gave notice of appeal to the Supreme Court from the action of the court in sustaining the demurrers to the petition for the cancellation of the judgments. The application for funding the outstanding indebtedness, as represented by the four judgments, came on for hearing which resulted in the court ordering the judgments to be funded as prayed for. The respondent excepted to the judgment ordering the issue of the funding bonds, and gave notice of appeal to the Supreme Court. The respondents have perfected their appeal from the order of the court sustaining the demurrers to the petition for cancellation of the judgments, and from the judgment of the court ordering the issue of funding bonds for the four outstanding judgments.

J. W. Bolen, the resident district judge, heard the four causes which resulted in the judgments involved herein. Respondents commenced a mandamus proceeding in the Supreme Court to compel the resident judge to certify his disqualification to hear the funding bond proceedings. The judge filed his response in the mandamus proceedings and later disqualified to hear the proceedings. The Chief Justice assigned A. O. Barrett as special judge to hear the funding bond proceedings.

The respondents have assigned several of the proceedings had in the trial of the cause as error for reversal here. The main objections to the judgment are: (1) That the court did not have jurisdiction of the subject-matter in the trial of the four causes which resulted in the judgments involved. (2) That notice was not published and posted by the board of county commissioners in the funding bond proceedings, as is required by law. (3) That the judgments were obtained by collusive acts between the parties with the knowledge of the trial judge. (4) That the claims upon which the judgments were based are fictitious and were created after the funds levied by the county had been exhausted.

The plaintiffs in error first attack the sufficiency of the published and posted notice given in the funding bond proceedings. The funding bond proceeding was set for hearing and heard on the 29th day of June, 1923, The notice of the hearing was posted as is required by law on June 18th. The notice was published in a newspaper located at the county seat on the 18th, 22nd, 24th, 25th and 26th of June, 1923. The question of the sufficiency of the published and posted notice is not involved in this case. The respondents attacked the proceedings, both on jurisdictional and nonjurisdictional grounds. The effect of such action was to enter the appearance of the respondents for all purposes. Ziska v. Avey, 36 Okla. 405, 122 Pac. 22; Pratt v. Pratt, 41 Okla. 577, 139 Pac. 261; Rogers v. McCord-Collins Merc. Co., 19 Okla. 115, 91 Pac. 864; Lookabaugh v. Epperson, 28 Okla. 472, 114 Pac. 738.

The cases cited by the respondents relate to special appearances and motion to quash, or in cases where default was made by the defendants. The persons for whom notice was intended responded and answered to the merits of this action.

The respondent assigns error on the ground that the court sustained the demurrers to his petition for the cancellation of the judgments. The judgment of the court sustaining the demurrer was not a final judgment from which the adverse party might appeal. The defeated party should elect to stand upon his petition, after the demurrer is sustained, if he desires to appeal from the action of the court. The ac-

tion of the court in overruling or sustaining a demurrer is not a final judgment against the losing party from which he may directly appeal to the Supreme Court. The errors assigned by the respondent in this respect are without merit. Exchange Oil Co. v. Crews, 90 Okla. 245, 216 Pac. 674.

The respondent predicates his right to intervene in the proceedings, and to attack the proceedings to fund the outstanding legal indebtedness of Pontotoc county upon that portion of section 4269, Comp. Stats. 1921, reading as follows:

"And person interested may remonstrate against the issuance of the same" (funding bonds).

Section 4268, Comp. Stats. 1921, authorized the several municipalities to fund their indebtedness, including bonds, **judgments,** and warrants. Authority is given by section 4269 to any interested party to attack the proceedings to fund the indebtedness described by section 4268, supra. The several sections do not define the grounds for attack, nor define what shall constitute the legal indebtedness referred to in section 4268, supra. The municipality, under the provisions of section 4268, is authorized to refund all indebtedness, and the general term is made to include bonds, judgments, and warrants. It is apparent that the validity of the indebtedness sought to be refunded must be measured by the legal and equitable rules ordinarily applied to determine the sufficiency of such evidence of indebtedness.

The section authorizes the funding of judgments, and this is the only class of indebtedness involved in this action. The several sections do not define the ground for attack against judgments. There is no indication that it was the purpose of the Legislature to permit the attack of judgments in the funding proceedings upon grounds other than those authorized by the general law. Therefore, it is material to determine whether a distinction is made between the grounds for collateral attack of a judgment against municipal corporations and the collateral attack of a judgment between individuals.

Ruling Case Law states the following rule:

"It was never doubted that under proper conditions an action at law might be maintained against a municipal corporation. Indeed, power to sue and be sued, as if it were an individual, either in the corporate name, or in that of one of its officers, is generally considered one of the essentials characteristic of a corporation of any character."

The cases of Hayden v. Middlesex Turnpike Corp., 10 Mass. 397, 6 Am. Dec. 143, and Boise Artesian Water Co. v. Boise City, 230 U. S. 84, 57 L. Ed. 1400, are cited in support of the rule.

The plaintiff is making a collateral attack upon the judgments entered in the four causes. The question arises as to what matters were concluded by the judgments rendered by the district court in the trial of the causes.

The Supreme Court of Kansas, in the case of Garden City v. Mer. & Far. Nat. Bank, 65 Kan. 345, 69 Pac. 325, 93 A. S. R. 284, had before it the question of a collateral attack upon a judgment rendered in a cause against a municipal corporation. The action involved the validity of certain funding bonds issued by a municipality, which had been questioned in a prior action. The court stated the rule as follows:

"When a matter is once adjudicated, it is conclusively determined between the same parties and their privies, as to all matters which were or might have been litigated, and this determination is binding as an estoppel in all other actions, whether commenced before or after the action in which adjudication was made."

The following cases are cited in support of the foregoing rule: Chicago R. R. Co. v. Com'rs Anderson County, 47 Kan. 767, 29 Pac. 96; Hoisington v. Bratey, 31 Kan. 560, 3 Pac. 353; Boyd v. Huffaker, 40 Kan. 634, 20 Pac. 459; Shepherd v. Stockham, 45 Kan. 244, 25 Pac. 559; Sanford v. Oberlin College 50 Kan. 342, 31 Pac. 1089; McDowell v. Gibson, 58 Kan. 607, 50 Pac. 870.

The question of relitigating a matter once tried between the parties, or within the issues made by the parties, was decided in the case of Pavelka v. St. Albert Society, 82 Conn. 146, 72 Atl. 725, 135 A. S. R. 263, and Vincent v. Blanton, 134 Ky. 590, 121 S. W. 466, 135 A. S. R. 424.

The Kansas bond case, to which we have made reference and reported in 65 Kan. 345, was cited in a note to the foregoing cases reported in the American State Reports as cited.

We call attention to the latter case to show that a collateral attack upon a judgment rendered against a municipality is governed by the same rules which relate to a collateral attack upon a judgment rendered in an action between individuals.

The rule adopted by this court in relation to matters concluded by a judgment is that a judgment concludes all matters presented within the issues in the trial of the cause, and those matters which might have been presented in support of the right to recover or in defense of the action. Board of County Commissioners, Day County, v. State of Kansas, 19 Okla. 375, 91 Pac. 699; Okla. Moline Plow Co. v. Smith, 81 Okla. 61, 196 Pac. 962; Brown v. Calvert, 57 Okla. 364, 157 Pac. 284; Johnson v. Gillett, 66 Okla. 308, 168 Pac. 1031; Bellamy v. Washita Valley Tel. Co., 25 Okla. 792, 108 Pac. 389.

The relationship between the municipal officers and the people is that of principal and agent. The law does not recognize a distinction in the relationship of principal and agent as between the acts of the agent for an individual and the acts of an agent for a municipality, if the acts of the municipal agent be within the delegated powers. The question is not the degree of burden which the agent casts upon his principal in a municipal contract, as compared with the burden which the agent creates by his contract against his principal as an individual. The inquiry in either instance is, whether the agent acted within the scope of powers delegated to him by the principal. The acts of the agent are binding upon the municipality, if the agent acts within the scope of the powers delegated to him by his principal. The result would be the same in either instance, if the agent exceeded his powers. The scope of action of a municipal officer for his principal is subject to the existing statutory limitations. The fact that the municipal agent's power is limited in some respects by statute does not impair the binding power of the agent within his scope of action.

The Supreme Court of Kansas aptly defines the status of the municipal officer in the case of County Commissioners of Shawnee County v. Carter, 2 Kan. 115:

"The county is a political subdivision of the state, acting as a corporation, with certain specified powers and acting through its officers in a certain prescribed way pointed out by law. These officers are the agents of the county, acting for it in all those matters confided to them by law."

The limitations do not go to the effect of the acts of the agents of the municipality confided to them by law, but the limitation is in the way of narrowing the number of duties which are assigned by law to the agents of the municipality.

The first inquiry is, Were the acts of the agent within the powers confided to him by law? If the acts relate to matters delegated to him by the principal, and the complaint is that of malperformance of the delegated powers, then the same principle of law will apply to the municipality as would be applied to an individual. The court will refuse to give effect to the acts of the agent outside of the powers delegated to him by the principal, which is the same rule as applies to an individual. It may be that the officers and agents of a municipality, who are authorized to institute and defend suits, may fail to urge the defenses, or lack the skill to make the defenses, which the circumstances warrant, but this is a matter of malperformance of delegated duties for which the principal is responsible. It is clear that an individual would not be able to attack a judgment collaterally upon the ground that his agent failed to use the degree of care which he ought to have exercised, in the defense of an action. If we should undertake by a strained and technical construction to relieve the municipality in such a case, it would be in violation of the usual rules applying in such cases. The effect would be to create uncertainty in the minds of those making contracts and dealing with municipalities. The acts of the agents of the municipality, and their contracts within the scope of the delegated powers, should be sustained by the same rules and with the same degree of clearness, as is applied to contracts between individuals. The malperformance by the agent of delegated powers, which cannot be corrected by the foregoing rules, should be left for correction by their principals in the selection of their agents and officers.

It is apparent that the respondent cannot exercise any greater latitude in attacking a judgment in a funding bond proceeding, than he could in the collateral attack of a judgment in any other proceeding. The several sections do not prescribe the grounds for attacking a judgment; consequently, the respondent must stand upon the legal and equitable rules prescribed for attacking a judgment collaterally. This means that a cause once tried cannot be retried, de novo, in a funding bond proceeding. The "remonstration" as it relates to the attack of a judgment must be governed by the same rules which would apply to the collateral attack of a judgment in any other proceeding. The indebtedness authorized to be funded by the several sections may include warrants and contracts. The respondent would be authorized to raise any question in relation to the validity of contracts and warrants in

a funding bond proceeding, that he might raise in the first trial of an action concerning the contracts and warrants. What we have said relates to the Wells judgment.

The respondent makes the charge against all the judgments that they were procured by collusive acts between the parties with the knowledge and consent of the trial judge. These allegations state a cause of action for cancellation of the judgments on the ground of fraud. It is not material whether the attack be a direct or a collateral proceeding, if cancellation is sought on the ground of fraud. A judgment procured in the manner described by the respondent in his petition will fall either in a direct or collateral attack. Ely Walker Dry Goods Co. v. Smith, 69 Okla. 261, 160 Pac. 898; Brown v. Trent, 36 Okla. 239, 128 Pac. 895; O'Brian v. Van Arsdale-Osborn Brokerage Co., 80 Okla. 174, 194 Pac. 1083; Dennis v. Kelly, 81 Okla. 155, 197 Pac. 442.

Numerous persons held claims against the county running all the way from two dollars to several hundred dollars. These claims were created during several fiscal years. The respondent was content to stand upon the proof that the funds were exhausted in February of the fiscal year 1922-23, and that the judgments were procured after the date named. The validity and merit of the claims were involved in the trial of the Wells suit. These were matters that were involved in the consideration and trial of the cause. There is quite a distinction between the allegations of the respondent's petition setting forth grounds for cancellation, and the proof offered and relied upon by the respondent for cancellation. The respondent failed to show that the claimants were guilty of collusive acts with the county in creating the claims, and in the procurement of the judgments. A different question would be made by the respondent, if he had proved the fraud which he charged. Fraud is a mixed question of law and fact and must be proved as any other fact. It is for the charging party to prove the facts alleged as constituting the fraud; it is for the court to determine whether such acts, in equity, constitute fraud. Oklahoma Pet. & Gasoline Co. v. Winship, 83 Okla. 146, 200 Pac. 844.

Fraud cannot be inferred as a question of fact, from facts which may be inconsistent with an honest purpose. Kemper, Hundley & McDonnell Dry Goods Co. v. Fischel, 4 Okla. 250, 44 Pac. 205: St. L. & S. F. Ry. Co. v. Reed, 37 Okla. 350, 132 Pac. 355.

The ground for cancellation relied upon

by the respondent as shown by the proof was involved in the first trial of the cause. The respondent abandoned his equitable grounds for cancellation in his proof and relies purely upon legal grounds; that is, that the several claims sued upon in the Wells Case exceeded the estimate made for the several fiscal years in which the claims were created.

The Supreme Court of Illinois, in the case of Gross v. People, 193 Ill. 260, 61 N. E. 1012, had before it in a collateral attack upon a judgment, the question of the right of the plaintiff to try questions which were involved or might have been involved in the first trial. That court said:

"Every question embraced in their first objection filed in this case could have been raised in the former proceedings. They were fully known to them all that time. The mere fact that they did not include in their former objections the matter now complained of is immaterial, inasmuch as they might have done so had they seen proper. The questions that are res judicata are not confined to those raised and insisted on at the former adjudication, but they embrace also those which were involved in the issue and might have been properly insisted on. Bailey v. Bailey, 115 Ill. 551, 4 N. E. 394; Warren v. Cook, 116 Ill. 199, 5 N. E. 538, 21 Am. Eng. Ency. of Law, 216."

There is quite a distinction between the action of the court, without jurisdiction, and a judgment reached by erroneous conclusions in the exercise of jurisdiction. The judgment of the court is void and subject to collateral attack, if it is without jurisdiction to deal with the subject-matter. If, in the exercise of vested jurisdiction over a subject-matter, error be committed in the doing of quasi-jurisdictional acts in the course of exercising vested jurisdiction, these errors are not reflected in the judgment; consequently, such errors, if any, entering into a judgment, are not subject to collateral attack. Abraham v. Homer, 102 Okla. 12, 226 Pac. 50.

The board of county commissioners, in relation to the construction of the bridges, admit that the contracts were entered into for the construction of the bridges, without first having provided funds for payment, and that the contracts were in excess of the levy made for all purposes in the particular year, but insist they were authorized to enter into the contracts under the provision made by section 10102, Comp. St. 1921, which reads in the following language:

"The board of county commissioners may pay for the **reconstruction** or repairing of

such county bridges as have been heretofore or may be hereafter damaged or **destroyed by floods,** and including bridges where the same, by reason of an emergency, have been repaired or reconstructed by any person or persons without first having contracted to repair or reconstruct the same with the said county commissioners; provided, that the authority granted by this section shall apply only to claims for repairing and **reconstructing bridges** previously owned by the county on the same site."

This is the first time that the section has been before the court for consideration. The general law relating to the construction of bridges requires that the following things be done: (1) That funds to pay for the construction be provided before entering into the contract for the building of the bridges. (2) That the county engineer must prepare plans and specifications showing the exact location of the bridge and that the same be filed in the office of the county clerk. (3) That when the bridge is to be paid for from the proceeds of a bond issue,, that the plans and specifications must be approved by the Highway Department. (4) That the letting of the contract for the construction of the bridges must be upon public notice and by competitive bidding. (5) That the notice of the bond election must show the location of the proposed bridges.

It is the practice, generally, to provide funds for the construction of bridges in the first instance by a bond issue. This rule applies, generally, in southeastern Oklahoma, as the property values and levies provided by legislative acts for all purposes will not enable the county commissioners to build the class of bridges as is involved in this action from a general levy. There are two propositions ordinarily involved in the construction of a county bridge: (1) The need for the bridge to accommodate travel and traffic between certain communities. (2) The exact location of the bridge across the stream in the most practical place from the standpoint of economy in construction and maintenance, and accommodating the traffic between the given points or communities. The residents and property owners of the county, who must pay for the cost of construction and who are familiar with the conditions, needs, and requirements for the bridge, are best suited to pass upon the question of the necessity for the bridge. The interested parties pass upon these questions in voting for or against the proposed bond issue. The exact location from the standpoint of economy in the construction and maintenance of the bridge is an engineering problem for the county engineer and Highway Department to pass upon. Board of County Commissioners of Sequoyah County et al. v. McGowan et al., 104 Okla. 283, 231 Pac. 258.

The bridges involved in this proceeding were constructed to replace other bridges which had been destroyed by floods and were rebuilt upon the old sites. The question of the need for the bridges had been passed upon in the first construction by the citizens and property owners of the county in voting on the bond issue; the matter of the exact location, as considered in relation to economy in construction and its most convenient location for traffic over the particular highway, had been passed upon by the engineering department in locating the first bridges.

The respondent says that the board of county commissioners cannot rely upon the provisions of this section for the reason that they entered into contracts for the construction of the bridges. The contention of the respondent is that the board of county commissioners, under the provisions of the section, must cause the construction of the bridges without any contract; that there must not be any agreement as to the cost of construction before the work is completed. We cannot agree with this contention. We think that neither party could **cause the county to pay a greater sum of** money for the construction of the bridges under this section than they would ordinarily cost by a public letting of the contract to the lowest and best bidder.

It is necessary to ascertain the meaning of this section in order to determine the intent and motive of the county commissioners, so that we may judge from their actions whether the contracts and judgments were the result of fraud and collusion among the parties. The section authorizes and provides for the construction of a bridge on the old site, where the bridge was destroyed by flood, without first making a contract. It is apparent under the general statutory provisions for the construction of a bridge in the first instance, that a contract means: (1) That funds have been provided in the statutory manner to pay the cost of construction. (2) That plans and specifications have been made, approved, and filed as is required by law. (3) That the contract has been let upon public notice by competitive bidding to the lowest and best bidder.

If we construe the section as meaning that the commissioners are relieved from giving

the usual public notice for the letting of the bridges, but that they must first provide funds, which ordinarily would require a bond issue before letting the contract, the statute is meaningless and affords no relief in the situation. To place the latter construction upon this section is to say that the action of the Legislature was aimless, and without any purpose to provide remedial and speedy relief in such an emergency. The legislative department was passing an act in relation to the reconstruction of a bridge destroyed by means which could not have been foreseen or anticipated. The county, therefore, could not have provided funds, or made provisions for restoring the public highway to use. The Legislature was providing for the reconstruction of a bridge, which had met with the approval of the citizens and property owners of the county, as to the question of need for the bridge, in voting the bonds for its construction in the first instance. The engineering problems had been settled. It is probable that as these questions already had been settled by the property owners of the county according to law, the Legislature did not see the need for submitting the same questions again to the residents and property owners and the engineering department, when there was urgent need to restore the public highway to travel without delay. The Legislature presumed, and we think rightfully so, that the residents and property owners would restore the bridges by bond issue, under the general statutes, since they had already voted the need for bridges in the first instance under the general law. Then why incur injurious delays in going through mere formalities?

This result was probably in the minds of the legislators in enacting the section where virtually all the bridges in the county had been destroyed by an unprecedented flood which left the public highway over the entire county impassable. The apparent meaning of the section is: (1) That the need for the bridge having been passed upon favorably by the residents and property owners of the county and the location of the bridge having been approved by the engineering department. (2) That the provisions being that the bridges should be relocated upon the old sites by the county commissioners. (3) That the county commissioners would be authorized to contract for the reconstruction of the bridges upon the old site at a cost, which ordinarily could be obtained by public notice and letting the contract to the lowest and best bidder. (4) That the board of county commissioners should be authorized to proceed to contract and cause the reconstruction of the bridges and the restoration of the highways to public travel before providing funds for the cost of construction.

In arriving at the intention of the legislative body in relating to the passage of some particular legislation, we should take into consideration the subject-matter and the apparent aims and purposes to be effected by the act. Unless this section should be given such construction, the section becomes meaningless and does not enable the county commissioners to restore the bridges in a shorter period of time than could be done under the general provisions.

When a legislative act requires construction, the act should be construed in a manner that would give it some real meaning, rather than that construction which renders it meaningless and ineffective in relation to the subject-matter to which it refers. McCarter v. Pitman, 82 Okla. 78, 198 Pac. 303; Harris v. Bell, 250 Fed. 269; St. L. & S. F. Ry. Co. v. Caldwell, 75 Okla. 153, 182 Pac. 688; Ledegar v. Bockoven, 77 Okla. 58, 185 Pac. 1097.

We are construing the section and its probable meaning in order to determine the motives and intentions of the parties in entering into the contracts, the intentions of the parties and the trial judge in rendering judgments upon the claims. The charge is that the claims have no support in law, and that the parties collusively entered into the contracts and procured the judgments by fraud and collusive action, with the knowledge and consent of the trial judge, with the intent and purpose of defrauding and injuring the property owners of the county. It is not necessary for us to go farther in construing the section than to determine probable construction placed thereon by the parties in letting the contracts to replace the bridges, and in securing judgments on the contracts. The board of county commissioners make the contention that they were authorized to let the contracts and cause the construction of the bridges for the reason they were replacing the bridges on the sites where the bridges had been destroyed by an unprecedented flood, to meet the urgent needs of the residents of the county. It is the contention of the board of county commissioners that under the section they were authorized to cause the building of the bridges without first providing funds to pay for the cost of the the reconstruction. We think the provisions of the section were sufficient to justify the plaintiffs and defendants in believ-

ing that they were proceeding in a lawful manner in rebuilding the bridges on the old sites, and in reducing the contracts to judgments. The respondent relies entirely upon the proof that funds had not been provided to pay for the reconstruction of the bridges before contracts were made for the work. The respondent insists that the board of county commissioners and the plaintiffs should have proceeded under the general statutes in relation to the construction of a bridge, in the first instance, in replacing the bridges destroyed by the floods.

Since it is apparent that fraud did not enter into the bridge contracts and that the parties were not acting collusively in procuring the judgments, what we have said in relation to the Wells judgment applies here.

The respondent makes the following statement in his brief at page 84:

"In view of the testimony that will be hereinafter referred to, this court can see that the taxpayers were playing the game with the 'cards stacked' against them. They tried to avoid this by getting a change o: judge. Before Judge Barrett, assigned to try the case, had heard a syllable of testimony, he had made up his mind."

The answer to the charge of the respondent in this respect is that he departs in his proof from the grounds charged for cancellation in his petition. The respondent is undertaking in the attack on the judgments in this case, to represent for trial the same questions which were involved in the trial of the cases in the first instance. He relies not upon fraud, but upon the proposition that the contracts and claims were illegal as measured by the rules of law. These questions, as we have said before, were involved in the trial of the causes in the first instance. Our court has said in this respect, in the case of Baker v. Vadder, 83 Okla. 140, 200 Pac. 994:

"A judgment of a court of competent jurisdiction delivered upon the merits of a cause, is final and conclusive between the parties in a subsequent action upon the same cause, not only as to all matters actually litigated and determined in the former action, but also as to every ground for recovery or defense which might have been presented and determined therein.

The same rule was given expression in the case of Moffer v. Jones, 67 Okla. 171, 169 Pac. 652, in relation to a collateral attack upon a judgment:

"In order for the plaintiff to prevail, he must establish that the court exceeded its jurisdiction, or that there was a want of jurisdiction to act. The distinction between what is requisite to authorize the court to act at all, and that which is necessary to sustain its action in a particular manner, must not be lost sight of, because it is only those matters, which render the proceedings void, that are available here."

The following cases support the rule: Pettis v. Johnston, 78 Okla. 277, 190 Pac. 681; Griffin v. Culp, 68 Okla. 310, 174 Pac. 495; Continental Gin Co. v. DeBord, 34 Okla. 66, 123 Pac. 159; Blackwell v. McCall, 54 Okla. 96, 153 Pac. 815; Rice v. Theimer, 45 Okla. 618, 146 Pac. 702; Rice v. Woolery, 38 Okla. 199, 132 Pac. 817; Edwards v. Smith, 42 Okla. 544, 142 Pac. 302; Cushing v. Cummings, 72 Okla. 176, 179 Pac. 762.

The record involved in this appeal does not present the same questions as were involved and decided in the case of Threadgill v. Peterson, 95 Okla. 187, 219 Pac. 389. The parties in the latter case contracted for repairs to the extent of $3,250 to be made on a school-house situated in the town of Coalgate. The contract was made contrary to the plain provisions of the law. No levy had been made for this particular work, nor did the school district have funds to pay for the repairs. Both parties entered into the contract contrary to the plain provisions of the law. The wording of the contract indicates that the parties fully realized that the contract was unlawful, as it was stipulated in the contract that the members of the school board should not be held liable. Since the contract was null and void according to plain provisions of the law, the parties were charged with bad faith in reducing the void contract to judgment The actions of the parties in this respect may be termed legal fraud. A judgment resulting from collusive acts of the parties, which amounts to legal fraud, is subject to direct or collateral attack. The parties were acting in concert through all the proceedings, apparently believing that the contract was unlawful. And consequently, they stand charged in equity with collusively procuring a judgment upon an unlawful and void contract. We would apply the same conclusions here, if the record presented the same questions as were involved in the Threadgill Case.

We might say in relation to the Wells judgment that a large portion of the judgment results from claims made by the East Central Hospital against the county for the care of insane persons sent from Pontotoc county to the asylum. The bills were rendered against the county pursuant to section 8296, Comp. St. 1921. A further and considerable item of the Wells judg-

ment results from claims arising during the several fiscal years for the maintenance of separate schools. We think in neither instance the county could escape the charges by failure to make levies.

But we do not pass upon these questions. The several sections of the statutes relating to the issuance of funding bonds are before the court for the first time. The grounds upon which the indebtedness must be attacked in the funding bond proceedings, in relation to judgments, have not been considered heretofore. We thought it better to measure the record and the right of attack as made in this case by the rules of law that ought to apply in such a case, in order that a precedent may be established for guidance in · considering similar questions in the future. As a matter of fact, we think the respondent failed to offer proof in relation to the Wells ' judgment, which would show that the claims were illegal. But we think the respondent should not be permitted to attack the judgments collaterally upon the questions involved the trial of the cause in the first instance, in the absence of establishing the collusive acts of fraud between and among all parties.

The judgment is affirmed.

By the Court: It is so ordered.

Note.—See under (1) 28 Cyc. p. 1581. (2) 33 C. J. p. 1079, §39; 34 C. J. pp. 532. §834; 555, §856. (3) 34 C. J. pp. 470, §738; 472, §739; 474, §742; 566, §866.